# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Elizabeth Placzek,<br><br>                                 Plaintiff,<br><br>        vs.<br><br>Mayo Clinic, and<br>Mayo Clinic Health System – Southeast<br>Minnesota Region,<br><br>                                 Defendants. | Court File No. 0:18-cv-02952-JNE-KMM<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' SUMMARY JUDGMENT MOTION** |

# TABLE OF CONTENTS

PAGE

FACT STATEMENT ................................................................................. 2

I.    MCHS-SE AND MC ...................................................................... 2

II.   PLACZEK'S EMPLOYMENT WITH MCHS-SE ............................... 3

      A.    Placzek's Agreement ........................................................ 4

      B.    MCHS-SE changes its compensation plan ......................... 5

III.  PLACZEK RAISES QUESTIONS ABOUT HER FTE ....................... 6

IV.   MC RECEIVES COMPLAINTS ABOUT PLACZEK'S CONDUCT ...... 8

V.    MC ENDS PLACZEK'S CA APPOINTMENT .................................. 9

VI.   PLACZEK SUFFERS A ███████████ IN OCTOBER 2015, BUT
      DOES NOT REQUEST STD ......................................................... 10

VII.  PLACZEK'S REQUESTS STD BENEFITS FOR 2015 IN 2016 ........ 11

VIII. PLACZEK'S STD CLAIM FOR 2016 ........................................... 11

IX.   PLACZEK'S PAID VACATION CLAIM .......................................... 12

X.    PLACZEK'S WHISTLEBLOWER ALLEGATIONS ........................... 13

      A.    Placzek's alleged whistleblower complaints .................... 13

XI.   PLACZEK LEAVES MCHS-SE ..................................................... 14

ARGUMENT ......................................................................................... 15

I.    SUMMARY JUDGMENT STANDARD ............................................ 15

II.   MC WAS NOT PLACZEK'S EMPLOYER ....................................... 15

      A.    MC is not a party to the Agreement and cannot be sued for allegedly
            breaching it (Count 1) .................................................. 16

i

# TABLE OF CONTENTS
## (CONTINUED)

PAGE

B.   Placzek's declaratory judgment and Section 181.101 claims are derivative of her contract claim .................................................................. 16

C.   MC was not Placzek's "employer" for purposes of the MWA.................. 17

III.   PLACZEK'S CONTRACT CLAIM FAILS............................................................ 19

A.   Placzek's STD Claims Are Untimely ........................................................ 20

1.   Placzek's 2015 STD Claim is Untimely ........................................ 21

2. Placzek's 2016 STD Claim is Untimely ................................................ 21

B.   MCHS-SE's STD Policy is not a contract ................................................ 21

C.   Placzek is not entitled to seven additional days of STD benefits for 2015.......................................................................................................... 22

D.   Placzek cannot prove an entitlement to STD benefits in 2016 based on her actual FTE level ............................................................................ 24

E.   Placzek Had No Right to Paid Vacation .................................................. 24

IV.   PLACZEK'S DECLARATORY JUDGMENT CLAIM FAILS BECAUSE HER CONTRACT CLAIM FAILS .......................................................................... 25

V.   PLACZEK'S SECTION 181.101 CLAIM FAILS ............................................... 26

VI.   PLACZEK'S WHISTLEBLOWER CLAIM FAILS............................................... 26

A.   Placzek did not report a violation or planned violation of law................. 27

B.   Placzek suffered no adverse employment action ....................................... 28

C.   No causal connection exists between Placzek's complaints to MC and the end of her CA appointment ......................................................... 29

D.   MC had legitimate reasons to end Placzek's CA appointment and she cannot show pretext ............................................................................ 31

CONCLUSION ........................................................................................................... 32

## TABLE OF AUTHORITIES

Page

**Cases**

*A Xiong v. Minneapolis Pub. Sch.*,
  2019 WL 4409715 (Minn. App. Sept. 16, 2019)........................................... 29

*Alexander v. Avera St. Luke's Hospital*,
  768 F.3d 756 (8th Cir. 2014) ...................................................................... 18

*Aslakson v. Home Sav. Ass'n*,
  416 N.W.2d 786 (Minn. App. 1987) ............................................................ 23

*Auto. 36, Inc. v. IMYGE Motorcars of Am.*,
  2003 Minn. App. LEXIS 1339 (Minn. App., Nov. 4, 2003) ........................ 16

*Bradford v. Norfolk Southern Corp.*,
  54 F.3d 1412 (8th Cir. 1995) ...................................................................... 29

*Brown v. Fred's, Inc.*,
  494 F.3d 736 (8th Cir. 2007) ...................................................................... 19

*Buytendorp v. Extendicare Health Servs., Inc.*,
  498 F.3d 826 (8th Cir. 2007) ...................................................................... 27

*Caldas v. Affordable Granite & Stone, Inc.*,
  820 N.W.2d 826 (Minn. 2012) .................................................................... 26

*Cf. Sandoval v. Am. Bldg. Maint. Indus., Inc.*,
  552 F. Supp. 2d 867 (D. Minn. 2008)......................................................... 17

*Cherry v. Ritenour Sch. Dist.*,
  361 F.3d 474 (8th Cir. 2004) ...................................................................... 32

*Cokley v. City of Otsego*,
  623 N.W.2d 625 (Minn. App. 2001) ........................................................... 26

*Coursolle v. EMC Ins. Group, Inc.*,
  794 N.W.2d 652 (Minn. App. 2011) ..................................................... 21, 22

*Dalton v. Dow Chem. Co.*,
  280 Minn. 158 N.W.2d 580, 584 (Minn. 1968)........................................... 20

*Dragonite v. South Lake Clinic, P.A.*,
    17-3785 (MJD/SER), ECF 59 (D. Minn., Oct. 2, 2019) ............................................. 32

*E.E.O.C. v. Prod. Fabricators, Inc.*,
    763 F.3d 963 (8th Cir. 2014) ......................................................................................... 31

*EEOC v. Kohler Co.*,
    335 F.3d 766 (8th Cir. 2003) ......................................................................................... 32

*Elkharwily v. Mayo Holding Co.*,
    823 F.3d 462 (8th Cir. 2016) ......................................................................................... 26

*Erenberg v. Methodist Hosp.*,
    357 F.3d 787 (8th Cir. 2003) ......................................................................................... 30

*Friedlander v. Edwards Lifesciences, LLC*,
    900 N.W.2d 162 (2017) .................................................................................................. 27

*Graham v. Crow Wing County Bd. of Comm'rs*,
    515 N.W.2d 81 (Minn. App. 1994) ........................................................................ 16, 25

*Greenwood v. Sheldon*,
    31 Minn. 254 (Minn. 1883) ........................................................................................... 16

*Guercio v. Prod. Automation Corp.*,
    664 N.W.2d 379 (Minn. App. 2003) ............................................................................. 21

*Hales v. Casey's Marketing Co.*,
    886 F.3d 730 (8th Cir. 2018) ......................................................................................... 15

*Hill v. Okay Const. Co.*,
    252 N.W.2d 107 (Minn. 1977) ....................................................................................... 20

*Holland v. Sam's Club*,
    487 F.3d 641 (8th Cir. 2007) ......................................................................................... 29

*Iyorbo v. Quest Int'l Food Flavors & Food Ingredients Co.*,
    2003 U.S. Dist. LEXIS 22987 (D. Minn., Dec. 19, 2003) ........................................... 15

*Judge v. Susee*,
    2006 WL 463534 (D. Minn. Feb. 24, 2006) .................................................................. 29

*Kasper v. Federated Mut. Ins. Co.*,
    425 F.3d 496 (8th Cir. 2005) ......................................................................................... 30

*Kiel v. Select Artificials, Inc.*,
    169 F.3d 1131 (8th Cir. 1998) ..................................................................... 30

*Klyuch v. Freightmasters, Inc.*,
    393 F. Supp. 2d 788 (D. Minn. 2005)..................................................... 31, 32

*Lake Co. v. Molan*,
    131 N.W.2d 734 (Minn. 1964) ................................................................... 23

*Lee v. Fresenius Medical Care, Inc.*,
    741 N.W. 2d 117 (Minn. 2007) ............................................... 17, 23, 24, 26

*McClure v. Davis Eng'g, L.L.C.*,
    716 N.W.2d 354 (Minn. App. 2006) .......................................................... 20

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)............................. 26

*Nat'l Union Fire Ins. v. Schwing Am., Inc.*,
    446 N.W.2d 410 (Minn. App. 1989) .......................................................... 23

*Osland v. City of Minneapolis*,
    2018 Minn. App. Unpub. LEXIS 756 (Minn. App., Sept. 4, 2018) ........... 30

*Park Nicollet Clinic v. Hamann*,
    808 N.W.2d 828 (Minn. 2011) ..................................................... 19, 20, 21

*Parkhill v. Minn. Mut. Life Ins. Co.*,
    174 F. Supp. 2d 951 (D. Minn. 2000)......................................................... 19

*Pine River State Bank v. Mettille*,
    333 N.W.2d 622 (Minn. 1983) ................................................................... 25

*In re RBC Dain Rauscher Overtime Litig.*,
    703 F. Supp. 2d 910 (D. Minn. 2010)......................................................... 28

*Sellner v. MAT Holdings, Inc.*,
    2018 U.S. Dist. LEXIS 20924 (D. Minn. Feb. 8, 2018)............................. 19

*Thompson v. Buhrs Americas, Inc.*,
    2009 U.S. Dist. LEXIS 16592 (D. Minn. Mar. 3, 2009) ............................ 19

*Warmbold v. MINACT, Inc.*,
    2017 U.S. Dist. LEXIS 175883 (D. Minn., Oct. 24, 2017) .................. 26, 27

*Williams v. Walski,*
 No. 2014 WL 4639580 (D. Minn. Sept. 16, 2014) ...................................................... 15

*Witzman v. Sjoberg,*
 164 Minn. 411 (Minn. 1925) ..................................................................................... 16

*Wojewski v. Rapid City Regional Hospital, Inc.,*
 450 F. 3d 338 (8th Cir. 2006) .................................................................................... 18

*Zhuang v. Datacard Corp.,*
 414 F.3d 849 (8th Cir. 2005) ..................................................................................... 29

**Statutes**

29 U.S.C. § 213(a)(1) ......................................................................................................... 28

Minn. Stat. § 181.931, subd. 3. ......................................................................................... 17

Minn. Stat. § 181.932, subd. 1 .......................................................................................... 17

Minn. Stat. § 181.932, subd. 1(1) ...................................................................................... 27

**Other Authorities**

29 CFR § 541.301, .304 ..................................................................................................... 28

29 CFR § 541.304(d) .......................................................................................................... 28

Defendants Mayo Clinic ("MC") and Mayo Clinic Health System-Southeast Minnesota Region (MCHS-SE") submit this memorandum in support of their motion for summary judgment on plaintiff Elizabeth Placzek's claims. Placzek cannot present evidence sufficient to support each of her four claims. Those claims should be dismissed.

Placzek, a pediatric emergency room physician, was hired by MCHS-SE in July 2013 to work in Austin, Minnesota. Placzek and MCHS-SE entered into a Physician Agreement ("Agreement") that governed the terms of her employment with MCHS-SE. The Agreement allowed MCHS-SE to establish her compensation/benefits and direct her work.

As part of her work for MCHS-SE, Placzek received a Clinical Associate ("CA") appointment to spend .20 of her full time equivalent position practicing at MC. The policy applicable to a CA appointment states that primary appointment, oversight and accountability for Placzek resided with MCHS-SE. As such, Placzek only had practice privileges at MC.

Placzek asserts in Count 1 that Defendants breached the Agreement by: (i) failing to pay her short-term disability benefits in 2015 when she ███████████████; (2) failing to pay a sufficient level of STD benefits in 2016 when she took a maternity leave; and (3) failing to provide paid vacation benefits during the second six weeks of her maternity leave.[1] [ECF 7, ¶¶ 23-24.] Placzek's breach of contract claim is meritless because:

---

[1] Placzek has pending before the Minnesota Department of Human Rights a charge of discrimination based on these same breach of contract allegations, along with several other

1.   MC is not a party to the Agreement; it cannot be sued for its breach as a result.

2.   Placzek's claims for STD benefits are time-barred by Minn. Stat. § 541.07(5).

3.   Placzek cannot prove that she is entitled to any additional STD benefits for 2015 or a specific level of STD benefits for 2016.

4.   Placzek cannot prove that she was entitled to "paid" vacation benefits as an ER physician working for MCHS-SE.

Count 2 seeks a declaratory judgment regarding her contract assertions.  Count 3 seeks wage penalties under Minn. Stat. § 181.101.  Both claims are derivative of Placzek's contract claim.  Because Placzek cannot prove a breach of contract, Counts 2 and 3 fail.

Finally, in Count 4, Placzek claims that MC retaliated against her in violation of the Minnesota Whistleblower Act ("MWA") after she discussed with MC Representatives her FTE status at MCHS-SE.  She alleges that MC retaliated by ending her CA appointment. Placzek, however, cannot prove that MC was her employer for purposes of the MWA.  Nor can she prove the required prima facie case or pretext even if MC was her employer.

## FACT STATEMENT

### I.   MCHS-SE AND MC.

MCHS-SE is a Minnesota corporation operating hospitals in various cities, including Austin and Albert Lea. [Gulden Dep. ("GD"), 10-11; Madsen Dep. ("MD"), 10.] These hospitals previously operated as separate corporations, but were recently merged into MCHS-SE.[2] [MD, 20.]  MCHS-SE is a wholly owned subsidiary of MC. [GDEC, ¶

---

assertions.  That charge is still being investigated by the MDHR.

[2] When she started with what is now MCHS-SE, Placzek's employer was Mayo Clinic Health System-Albert Lea and Austin. [Placzek Depo. ("PD"), Ex. 6.]  That corporation

3.] MCHS-SE has its own board of directors; MC does not control MCHS-SE's day-to-day operations.[3] [MD, at 11.]

MC and MCHS-SE have created a Clinic Associate ("CA") Program that allows an MCHS-SE physician to obtain privileges at MC. [GDEC, ¶ 4-7, Ex. A.] The CA Program allows a MCHS-SE physician to practice at MC for up to 20% of that physician's FTE. [MD, 20.]This program has benefits to both organizations. [*Id.*] Under the CA Program, MCHS-SE is the employer of the CA and retains primary appointment, oversight, and accountability for that physician. [*Id.*] When a CA practices at MC, she must follow MC's Model of Care program and its general policies and expectations; failure to do so can result in the termination of a CA's appointment at MC.[4] [*Id.*]

## II.   PLACZEK'S EMPLOYMENT WITH MCHS-SE.

Placzek, a pediatric emergency room physician, started working for MCHS-SE in July 2013. [PD, 52.] She was paid on a salary or fee basis; also, her primary duties required advanced knowledge of medical issues that she acquired by a prolonged course of specialized intellectual instruction in a field of science or learning. [*Id.*, 233-34.] Placzek, therefore, was classified as professionally exempt. [GDEC, ¶ 9.]

---

was later merged into MCHS-SE. [Gulden Decl. ("GDEC"), ¶ 2.]

[3] Each organization hires its own employees. [GD, 11.]

[4] Appointments are reviewed every two years and may be discontinued. [GDEC, Ex. A, at 2; MD, 82.]

3

A.    **Placzek's Agreement.**

Placzek signed the Agreement with MCHS-SE prior to starting her employment.[5] [PD, Ex. 6.] The Agreement lists the "parties" as Placzek and MC Health System-Albert Lea and Austin (now MCHS-SE). [*Id.*]

Under the Agreement, Placzek "perform[ed] all of the duties that may be required by Employer [MCHS-SE] . . . at the times and locations determined by Employer." [*Id.*, Ex. 6, § 2.] Placzek worked a schedule "as determined by Employer under its policies for full-time physicians." [*Id.,* § 3.] Initially, she was assigned 80% at MCHS-SE and 20% under a CA appointment at MC. [*Id.*] Placzek admits that MCHS-SE had the right to determine her assignments and schedule. [*Id.*, 54-55.]

Placzek received compensation according to MCHS-SE's compensation policy, as established by its board of directors. [*Id.*, 57-58, Ex. 6, Ex. A.]

Placzek was initially paid an hourly rate, not an annual salary. [*Id.*, 63-65.] Under this model, vacation pay was built into the hourly rate. [GDEC, ¶¶ 10-11.] An ER physician who took days off under the hourly model did not get paid vacation. [*Id.*]

The Agreement states that Placzek would participate in MCHS-SE's benefits "to the extent set forth under the terms of such plans, as adopted and amended by Employer from time to time." [*Id.,* Ex. 3, § 9.] Placzek could take "vacation," but only "as determined by Employer under its related policies and procedures." [*Id.*] Placzek had to satisfy any conditions that applied to MCHS-SE's benefits and MCHS-SE could modify her benefits

---

[5] The Agreement is the "contract" Placzek claims was breached. [PD, 44.]

4

at any time. [*Id.*, 58-59, 61.] The Agreement says that Placzek would receive "vacation," but does not refer to it as "paid." [MD., 26] Also, the Agreement says that Placzek would receive "vacation" only "as determined by Employer under its related policies and procedures." [PD, Ex. 6, ¶ 9.] Under MCHS-SE's compensation structure during Placzek's employment, ER physicians could request time off, but that time off was unpaid. [MD, 21.]

MC is not a party to the Agreement and Placzek has no separate agreement with MC. [PD, 51, Ex 6.]

## B.   MCHS-SE changes its compensation plan.

At the start of 2016, MCHS-SE switched from paying ER physicians hourly to paying a salary. [PD, 65, 233; GD, 31, 66.] Under the salary model, a 1.0 FTE ER physician was required to work 1680 hours annually. [PD, 76-78.] This means that a full-time ER physician at MCHS-SE works only 35 shifts quarterly, amounting to 140 shifts annually, and is not required to work the other 225 days of the year. [MD, 30-31; PD, 76-78.]

If an ER physician is assigned to work less than 1.0 FTE, the shifts required per quarter are adjusted. [PD, 75-78.] The per-quarter shifts for a physician assigned a .70 FTE would be 24.5. [*Id.*]

Each quarter, MCHS-SE "trued up" a physician's compensation based on the number of shifts worked. [PD, 87-88.] If a physician worked less than the required number of shifts, MCHS-SE could reduce the physician's annual compensation. [*Id.*] MCHS-SE, however, gave physicians one quarter to "make up" a missed shift so as to not impact

5

compensation. [GDEC, ¶¶ 12-13.] If a physician worked more than the required number of shifts, she received additional compensation in the form of incentive pay. [GD, 68; MD, 65; PD, 86-93.]

Like the hourly model, the salary model built vacation into the annual salary set for ER physicians. [PD, 183-84.] Thus, ER physicians at MCHS-SE do not receive traditional paid vacation. [GD, 36.]

Once the salary model was implemented, MCHS-SE sent Placzek a memo regarding it. [PD, 66; GD, 32; MD, 75-76, Ex. 21.]

Placzek seeks to use the change in compensation models as the basis for her paid vacation claim, but the salary model did not grant Placzek a right to paid vacation; it continued the practice under the hourly model. [MD, 63, 65, Ex. 19.] ER physicians were permitted under the salary model to request days within a quarter that they did not wish to work, but those days were unpaid. [PD, 78-79, 81; GD, 61-62.]

Placzek learned about the salary model, including the vacation component, in department meetings, at a retreat at which the new model was explained, in individual meetings, and in emails. [GD, 32; GDEC, ¶ 10, Ex. B.]

Placzek understood that vacation was built into her salary payments. [PD, 184, 186.] Thus, Placzek never "accrued" paid vacation. [*Id.*, 71, Ex. 8.]

## III.   PLACZEK RAISES QUESTIONS ABOUT HER FTE.

Placzek was hired as a 1.0 FTE employee. [*Id.*, 53, Ex. 6.] In 2014, Placzek thought she was being "overschedule[ed] compared to what full-time looked like" and needed additional time off to take her boards. [*Id.*, 40, 191.] Dr. Laura Walker, the medical

director at the Austin hospital, approved Placzek's request to lower her total FTE to .90, with .70 assigned to MCHS-SE and .20 to her CA appointment. [*Id.*, 191.]

In 2016, Placzek raised with MCHS-SE leadership a perceived inequity in her assigned FTE (.90) based on the number of shifts she was working each quarter (25). [*Id.*, 196-97; GDEC, ¶ 14.] Placzek claimed that her actual FTE level was .913 because she worked 25 shifts each quarter.[6] Placzek raised this issue despite being classified as professionally exempt. MCHS-SE leadership met with Placzek to discuss her FTE status and offered her three options: (1) adjust her MCHS-SE FTE to .7143 to equal 25 shifts/quarter, (2) decrease her MCHS-SE FTE to .6857 to equal 24 shifts/quarter, or (3) alternate monthly between 24 and 25 shifts. [GD, 81-82, Ex. 10.] Placzek eventually elected Option 3. Her annual salary would not change under any of these options. [GDEC, ¶ 15, Ex. C.]

In September 2016, Placzek requested that her FTE be increased back to 1.0. [PD, 163, Ex. 17.] MCHS-SE granted this on September 19, 2016, assigning .80 of to MCHS-SE and .20 to the CA appointment. This change would become effective December 28, 2016. [*Id.*]

Throughout this process, communicating with Placzek was difficult given the manner in which she chose to communicate. According to Christopher Gulden, Operations Administrator for MCHS-SE:

---

[6] Placzek worked 25 shifts/quarter because MCHS-SE could not split shifts. MCHS-SE rounded Placzek's 24.5 shifts up to 25 so that she would meet her minimum required shifts. [PD, 70; GD 53, 77.]

> To be honest, our communication with Beth was very difficult. She would oftentimes not respond back or respond back to somebody else. And reach out to multiple people as well.

[GD, 83-86.] Placzek even reached out to MC staff, who did not control her employment with MCHS-SE. [*See infra* at X.A.]

## IV.   MC RECEIVES COMPLAINTS ABOUT PLACZEK'S CONDUCT.

Within months of Placzek starting at MC, ER employees began complaining about her conduct and interactions.[7]  [PD, 104; SDEC, ¶ 7, Ex. 3.]  These complaints continued throughout her CA appointment.  [SDEC, Ex. 3.]  The complaints include concerns with how Placzek interacted with staff, patients, and families.  [*Id.*]  Placzek also received 360 performance assessments that were poor.  [*Id.*]  MC leadership met with Placzek several times trying to improve her performance.  [*Id.*]



This complaint initiated an internal investigation.  [SDEC, ¶ 8.]  Around this same time, Placzek lapsed on her charting obligations.  [PD, 215.]

---

[7] At the time, the Mayo Clinic Emergency Department was managed by Dr. Annie Sadosty, Chair of the Mayo Clinic Emergency Department.  [Madsen Dep., 81; PD, 111.]

[8] At Placzek's deposition, Defendants' counsel mistakenly referred to the date of this incident as "November 2016," when the incident occurred in November 2015.

In August 2016, Dr. Sadosty reported her concerns about Placzek's difficulties managing "nuance situations" and "communication difficulties." [SDEC, Ex. 3.]

On September 21, 2016, an MC physician reported unsolicited negative feedback from nurses, students, and child life specialists about Placzek.[9] [Id., 107-108; SDEC, ¶ 9, Ex. 5.]

## V.  MC ENDS PLACZEK'S CA APPOINTMENT.

MC ended Placzek's CA appointment in late September 2016 because of her inappropriate conduct.  Dr. Sadosty and Dr. Christopher Russi, Chair of Emergency Medicine Connected Care and Innovation at MC, made this decision.  [SDEC, ¶ 4, Ex. 2; RDEC, ¶ 4.]  They told Placzek on September 23, 2016, and sent a written memorandum on October 11, 2016.  [PD, 114, 210-13, Ex. 12.] Placzek's CA appointment ended on January 1, 2017.  [Id.]

During the meeting, Drs. Sadosty and Russi explained that Placzek's performance failed to meet MC's standards.  [PD, 214-18.]  They also explained that cancellation of Placzek's CA assignment had no effect on her MCHS-SE employment.[10]  [PD, 115, 212, Ex. 12.]

When it learned of this decision, MCHS-SE agreed to increase Placzek's work load at MCHS-SE from a .80 FTE to 1.0.  [GDEC, ¶ 14.]  This increase would become effective

---

[9] Placzek has received similar complaints about her conduct at her current employer. [PD, 116-18.]

[10] Placzek agrees that if Mayo Clinic found a pattern of issues showing a lack of respect or other inappropriate conduct, a review of its relationship with a physician would be warranted. [PD, 114-15.]

on that same date the CA appointment ended.  [*Id.*]  Placzek, however, chose in January

2017 to return from a maternity leave at a .80 FTE.  [PD 120; GDEC, ¶ 14.]

**VI.   PLACZEK SUFFERS A ███████████ IN OCTOBER 2015, BUT DOES NOT REQUEST STD.**

Placzek suffered ███████ in October 2015.  [PD, 120-121.]  She spoke to Dr.

Walker and said she would be absent for at least one of her shifts, but understood that this

contact was to make sure that her shifts were covered.  [*Id.*, 125, 150.]  Placzek never asked

Dr. Walker or others at MCHS-SE for short-term disability benefits at this time.  [*Id.*, 151-

52.]

Placzek cannot identify any dates on which she claims a right to STD benefits during

2015.  [PD, 140-41.]  Indeed, Placzek admits that her damages calculation for this alleged

failure to pay STD includes days on which she was not scheduled to work and for which

she traded shifts with another physician.  [PD, 123, Ex. 3, at 7.]

MCHS-SE's STD Policy requires employees to complete paperwork on-line and

submit a claim to Recovery Claims Services ("RCS") for processing.  [GD, 94, Ex. 7.]

Following submission of a claim, RCS automatically sends an authorization for release of

medical information.  [*Id.*, 88.]  After receipt of the information, RCS approves or denies

the claim on a cases by case basis.  [*Id.*, 95-97, Ex. 7.]  STD only covers specific days an

employee is scheduled but unable to work.[11]  [*Id.*, 96-99.]  Placzek did not follow this

procedure in the fall of 2015.  [PD, 126-28.]

---

[11] The STD policy also states "[t]he contents of this policy are not intended to constitute a contract of employment" and is subject to change at MCHS's sole discretion.  [PD, 159,

## VII.   PLACZEK'S REQUESTS STD BENEFITS FOR 2015 IN 2016.

Before giving birth to a child in October 2016, Placzek requested—for the first time—STD benefits related to her ███████████. [GD, 110, 122, 124.]

Mr. Gulden and Ms. Fleegel investigated and determined that Placzek had never initiated a claim. [*Id.*, 109-112.]   Nonetheless, to be fair, they worked with RCS to determine what would have been approved in 2015 had Placzek timely submitted a claim. [*Id.*, 110, 114, Ex. 13.]   Mr. Gulden and Ms. Fleegel determined that RCS would have approved three days of STD related to Placzek's ██████. [*Id.*, 109-12.]   Placzek also claimed that she had missed several days because of doctor's appointments related to her ████████, so MCHS-SE included an additional two days of STD. [*Id.*, 120-121, Ex. 13; PD, 120-121, Ex. 3, at 7.]   These five days of STD amounted to $6,948.08. [*Id.*]   Placzek, however, claims she should have received 12 days of STD in the amount of $13,431.76. [PD, Ex. 3, at 7.]

## VIII.   PLACZEK'S STD CLAIM FOR 2016.

Beginning in October 2016, Placzek took twelve weeks of maternity leave and received short-term disability for the first six weeks. [PD, 32, 74, Ex. 8, Ex. 15.]   MCHS-SE paid STD benefits based on Placzek's then-current total FTE status of .90. [GDEC, 15, Ex. C.]   Placzek admits that she received $12,822.19 in STD benefits at this time. [PD, Ex. 3, at 8.]

---

Ex. 15.]   Placzek acknowledged that if she had any questions about her benefits, she could contact Mr. Gulden or Monica Fleegel, an HR representative, for clarification. [PD, 138.]

11

Placzek claims that MCHS-SE under-calculated the value of those benefits by using her assigned .90 FTE rather than what she claims her FTE actually was based on total shifts worked (.913).[12] [*Id.*, 157-61, Ex. 3, at 8.] The difference is $1,219.53. [*Id.*, Ex. 3, at 8.]

Placzek can point to no portion of the applicable STD Policy requiring MCHS-SE to pay her STD based on her actual versus assigned FTE. [*Id.*, 155-61.] MC calculates the STD benefits based on a physician's assigned FTE level, regardless of the number of shifts worked. [*Id.*, at 160-61, Ex. 17.]

## IX.   PLACZEK'S PAID VACATION CLAIM.

Placzek claims entitlement to paid vacation for the second six weeks of her maternity leave. [PD, Ex. 3, at 8.] But Placzek was not entitled to paid vacation or any other paid leave. [*See supra* at II.A; MD, 74; PD 32, 176, Ex. 18.] If she was not entitled to paid vacation, Placzek agrees that this period of her leave should be unpaid. [*Id.*, 180.]

Placzek can point to no document that provides her, as an ER physician, with the right to receive paid vacation. Indeed, Placzek testified that vacation was already factored into her salary payments. [*Id.*, 184.]

Placzek may point to discussions she had in April 2016 with Jamie Toft, a MC medical secretary, related to her maternity leave. [GD, 72, Ex. 8; MD, 74, Ex. 20.] Ms. Toft, however, was not the correct person to answer these questions because she was not

---

[12] Placzek's interrogatory answers mistakenly refer to her FTE as .70, rather than .90. [PD, Ex. 3, at 8.] Placzek was paid STD benefits in 2016 based on her total FTE of .90, not just the portion that relates to her practice specifically at MCHS-SE. [GDEC, Ex. C.]

employed by MCHS-SE. [MD, 74; GD, 46, Ex. 6.] Nevertheless, Ms. Toft provided

Placzek with an FMLA policy and parroted a portion of the policy back to her in an email:

> The FMLA policy for consultants is attached above. You are allowed 12
> weeks off. The first six weeks you will get Short-Term Disability then the
> next six weeks you can either use vacation/PTO time or have off without pay
> (forms will need to be completed and submitted to department chair and HR).

[MD, 74, Ex. 20.] Ms. Toft's response was accurate; *had* Placzek been an employee who

accrued paid vacation, she would have received paid vacation to cover the second six weeks

of her leave. [*Id.*, 74.]

## X.   PLACZEK'S WHISTLEBLOWER ALLEGATIONS

Placzek's whistleblower claim is asserted only against MC. [ECF 7, ¶¶ 38-42.]

Based on alleged reports Placzek claims to have made in 2016 [PD, 186-209], she asserts

that MC, not MCHS-SE, retaliated against her by ending her CA appointment. [*Id.*] The

facts surrounding MC's decision to end this appointment are discussed above. [*See supra*

at IV-V.]

### A.   Placzek's alleged whistleblower complaints.

Placzek claims that in 2015, she spoke with Dr. Walker and Ginny Larson "because

they were trying to help me figure out how to change the FTE on paper so that way when

they did round up, that it was at least something that would let me take my boards that were

in early 2015." [PD, 190-92.]

Placzek also claims that in the spring of 2015 she and other CAs met with Drs.

Sadosty and Russi to discuss issues regarding what they considered a "progressively unfair

burden" that arose because their assigned FTE level was different from the number of shifts they worked.[13]  [*Id.*, at 187-89.]

Placzek further claims that she discussed with MCHS-SE leadership (Mr. Gulden, Dr. Madsen, and Ms. Fleegel) in 2016 "the failure to pay the short-term disability benefits [in 2015], trying to match the FTE, and that the value of my wages had been reset lower when they were claiming that it had stayed neutral, because they are allowed to change it lower if that was really the intent, but they only lowered it for some people and not for others." [*Id.*, 196-204.]

Finally, Placzek claims to have discussed with "Dawn" in the MC Office of Staff Services[14] ("OSS") "various concerns she had." [*Id.*, 205-09.]  According to Placzek, Dawn was "more of like a triage person in the Office of Staff Services, so she heard the variety of the concerns that I had and then directed me to different people to more specifically address individual topics." [*Id.*, 206.]

## XI.  PLACZEK LEAVES MCHS-SE.

Placzek began looking for new employment in October 2016.  She had discussions with several organizations and accepted a position with Midwest Emergency Associates, LLC, in Illinois.  [PD, at 237-44.]  On October 23, 2017, Placzek gave 60 days' notice

---

[13]  Neither Drs. Sadosty nor Russi had authority to discuss Placzek's FTE status at MCHS-SE because they worked for Mayo Clinic.  [SDEC, ¶ 2; RDEC, ¶ 2.]  Both re-directed Placzek back to leadership at MCHS-SE.  [SDEC, ¶ 3; RDEC, ¶ 3.]

[14]  OSS assists Mayo Clinic physicians with various issues related to their practice.  [PD, 194-195; GD, 39-40.]

under Section 12 of the Agreement that she was resigning from MCHS-SE and terminating the Agreement effective December 23, 2017.  [PD, 236-37, Ex. 20.]

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate "when viewing the evidence in a light most favorable to the non-moving party, no genuine issue of material fact exists and the nonmoving party is entitled to judgment as a matter of law." *Hales v. Casey's Marketing Co.*, 886 F.3d 730, 735 (8th Cir. 2018).  Once the moving party demonstrates "the absence of a genuine issue of material fact," the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Williams v. Walski*, No. 2014 WL 4639580, at *5 (D. Minn. Sept. 16, 2014) (summary judgment appropriate when non-moving party fails to establish "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

Placzek cannot meet her burden.   The record evidence and applicable law demonstrate that MCHS-SE and MC are entitled to judgment on each of her claims.

### II.   MC WAS NOT PLACZEK'S EMPLOYER.

Placzek brings all of her claims against MC.  [ECF ¶ 7, 23, 31, 34, and 39-41.]  But Placzek cannot prove that MC was her employer.  *Iyorbo v. Quest Int'l Food Flavors & Food Ingredients Co.*, 2003 U.S. Dist. LEXIS 22987, at *7-8 (D. Minn., Dec. 19, 2003).

**A.   MC is not a party to the Agreement and cannot be sued for allegedly breaching it (Count 1).**

Count 1 is based solely on the Agreement.  [PD, 44.]  MC is not a party to the Agreement.  [*Id.*, Ex. 6, at 1.]  Because MC is not a party to the Agreement, Placzek lacks privity to sue MC for its alleged breach.

In Minnesota, "no one can sue for the breach of a contract who is not a party or in privity to the contract."  *Auto. 36, Inc. v. IMYGE Motorcars of Am.*, 2003 Minn. App. LEXIS 1339, *7 (Minn. App., Nov. 4, 2003).  Privity is established "by showing legal relationship to the contract or its parties."  *Id.*; *see Greenwood v. Sheldon*, 31 Minn. 254, 255 (Minn. 1883); *Witzman v. Sjoberg*, 164 Minn. 411, 413 (Minn. 1925).  Placzek can show no privity of contract between her and MC because MC is not a party to the Agreement.

**B.   Placzek's declaratory judgment and Section 181.101 claims are derivative of her contract claim.**

Placzek's declaratory judgment claim is derivatively based on her contract claim. [ECF 7, ¶¶ 28-31.]  Because MC was not a party to the Agreement, Placzek is not entitled to a declaratory judgment that MC has breached the Agreement.  *Graham v. Crow Wing County Bd. of Comm'rs*, 515 N.W.2d 81, 84 (Minn. App. 1994).

Similarly, Placzek's claim under Minn. Stat. § 181.101 is based on the alleged denial of benefits by MCHS-SE, not MC.  [PD, Ex. 3, at 7-8; ECF 7, ¶¶ 23-27.]  Because MC did not owe her these benefits, Placzek lacks standing to bring her Section 181.101 claim.

Section 181.101 does not define when, or if, an employee earns employer-provided paid time off.  That decision is based on a contract between the employer and employee.

16

*Lee v. Fresenius Medical Care, Inc.*, 741 N.W. 2d 117, 125-30 (Minn. 2007).  As the

Minnesota Supreme Court ruled in *Lee*,

> "No statute or case law in Minnesota mandates the terms on which paid time
> off must be offered.  As we stated in *Tynan*, employers' 'liability as to
> vacation-pay rights is wholly contractual.'"

> \* \* \*

> In other words, employers may offer, and employees may accept, a contract
> provision that attaches conditions to the right to accrued vacation 'wages,'
> whether in the form of actual paid time off or payment in lieu of paid time
> off.

*Id.*  Because MC is not a party to the Agreement under which Placzek seeks benefits, she

has no standing to sue MC under Section 181.101.  *Lee*, 741 N.W. 2d at 125-30.

### C.    MC was not Placzek's "employer" for purposes of the MWA.

The MWA applies only to Placzek's "employer," Minn. Stat. § 181.932, subd. 1,

which is defined as "any person having one or more employees."  *Id.*, § 181.931, subd. 3.

Placzek must prove that MC was her "employer" under the MWA.  *Cf. Sandoval v. Am.*

*Bldg. Maint. Indus., Inc.*, 552 F. Supp. 2d 867, 872-73 (D. Minn. 2008).  She cannot meet

this burden.

The Agreement states that Placzek's "employer" was MCHS-SE.  [PD, Ex. 6, at 1.]

MC is not mentioned in the Agreement as having any obligations to Placzek other than her

.20 appointment privileges.  The CA program also makes clear that MCHS-SE retained

oversight and accountability for Placzek.  [GDEC, Ex. A, at 1.]

Placzek may argue that her CA appointment supports the conclusion that MC was

her "employer" for purposes of the MWA.  But the mere granting of privileges at a hospital

does not make a physician an "employee" for purposes of statutory claims such as those

17

under the MWA. *See Wojewski v. Rapid City Regional Hospital, Inc.,* 450 F. 3d 338, 343 (8th Cir. 2006) (in ADA, ADEA, and FMLA case, the mere granting of privileges by hospital did not make hospital the "employer" under these statutes); *Alexander v. Avera St. Luke's Hospital,* 768 F.3d 756, 762 (8th Cir. 2014) (same in ADA case). As noted in *Alexander,* other circuits have reached the same conclusion. *See Levitin v. Northwest County Hosp.,* 923 F.3d 499, 501 (7th Cir. 2019) ("we have repeatedly held that a physician with hospital practice privileges is not the hospital's employee merely because he is subject to peer review"). That conclusion applies here, as well. MC was not Placzek's employer for purposes of the MWA.

The CA Program clearly defines that MC and MCHS-SE have separate leadership and boards; also, MC has no control over the day-to-day operations of MCHS-SE. [MD, 11, 20.] MC did not directly supervise Placzek's work as a CA, telling her only to follow MC's patient care standards. [MD, 81; PD, 111.] These facts demonstrate that there was no employer-employee relationship between MC and Placzek for purposes of the MWA. *Id.*

Placzek's CA appointment is no different than any other physician-hospital relationship. The physician is granted privileges to practice at the hospital. Those privileges do not establish an employment relationship. Even though Placzek was required to follow MC's patient care standards, this requirement does not establish an employment relationship, given the nature of a hospital's obligation. Indeed, in *Glascock v. Linn County. Emergency Med.,* 698 F.3d 695, 698 (8th Cir. 2012), the Eighth Circuit noted that "the issue of control is less useful in the context of emergency room physicians than in

18

some other settings because a hospital 'must assert a degree of conflicting control over every doctor's work . . . to discharge its own professional responsibility to patients,' regardless whether the physician is an employee or independent contractor." The same analysis applies here to Placzek—an ER physician.

Placzek also has no facts that would defeat the "strong presumption that a parent company is not the employer of its subsidiary's employees . . ." *Brown v. Fred's, Inc.*, 494 F.3d 736, 739 (8th Cir. 2007); *Thompson v. Buhrs Americas, Inc.*, 2009 U.S. Dist. LEXIS 16592, at *16 (D. Minn. Mar. 3, 2009). Similarly, the evidence does not support a finding the MC and MCHS-SE were joint employers. *Sellner*, 2018 U.S. Dist. LEXIS 20924, 21-28.

Because MC was not Placzek's employer, the MWA against MC fails. Also, the MWA claim is brought only against MC and not MCHS-SE, so Placzek has no such a claim against MCHS-SE.

## III.   PLACZEK'S CONTRACT CLAIM FAILS.

In order to establish a breach of contract, Placzek must show (1) formation of a contract; (2) performance by Placzek of any conditions precedent; (3) a material breach of the contract by MCHS-SE; and (4) damages. *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000); *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). Placzek cannot satisfy these elements with respect to MCHS-SE.

Placzek claims that MCHS-SE[15] breached the Agreement by: (1) failing to pay seven days of STD in 2015; (2) failing to properly calculate STD in 2016; and (3) failing to provide paid vacation in 2016. [PD, Ex. 3, at 7-8.] Placzek's STD claims are barred by the statute of limitations, Minn. Stat. § 541.07(5). She also cannot prove a contract because the STD Policy at issue disclaims the existence of a contract. Further, Placzek cannot prove that MCHS-SE was required her to pay her STD in 2015 because she failed to request them and MCHS-SE paid her for five days already. Placzek also cannot prove that MCHS-SE was required to pay STD in 2016 based on Placzek's actual, versus stated, FTE. Finally, Placzek cannot prove an entitlement to paid vacation.

## A.    Placzek's STD Claims Are Untimely.

Placzek's claims for STD benefits are time-barred. Under Minn. Stat. § 541.07(5) all actions "for the recovery of wages" must be brought within two years. Minnesota courts have consistently applied Minn. Stat. § 541.07(5) whenever "the gravamen of the action is the breach of an employment contract." *Park Nicollet Clinic*, 808 N.W.2d at 832.

A cause of action accrues when all of the elements of claim have occurred. *Dalton v. Dow Chem. Co.*, 158 NW 2d 580, 584 (Minn. 1968); *McClure v. Davis Eng'g, L.L.C.*, 716 N.W.2d 354, 359 (Minn. App. 2006). Where a contract or policy does not specify a time for performance, the law implies a reasonable time. *Hill v. Okay Const. Co.*, 252 N.W.2d 107, 114 (Minn. 1977).

---

[15] To the extent Placzek continues to claim that her breach of contract claim is properly asserted against Mayo Clinic, which Mayo Clinic demonstrates above is incorrect, these same arguments apply to Mayo Clinic. As a result, any contract claim against Mayo Clinic is meritless and should be dismissed for the same reasons.

### 1.   Placzek's 2015 STD Claim is Untimely.

Placzek filed her lawsuit on October 18, 2018. [ECF 1.] She claims to have notified Dr. Walker in October 2015 of her need for STD at that time. [PD, 125, 150.] Any claim related to this request would have accrued when Placzek learned that MCHS-SE had not paid any STD, which would have happened either on her next pay date (October 13, 2015) or the following pay date (October 27, 2015). Having known in October 2015 that she was not paid STD, Placzek was required under Sections 541.07(5) to file her claim for these alleged benefits by October 2017. She did not do so. Her claim for 2015 STD benefits, therefore, is untimely. *Park Nicollet Clinic*, 808 N.W.2d at 832.

### 2.   Placzek's 2016 STD Claim is Untimely.

Placzek's STD claim for October 2016 is also untimely. Placzek's 2016 STD claim is based on MCHS-SE's failure to slightly increase her FTE level to match the hours she worked. [PD, 165, Ex. 3, at 8.] But the decision not to increase her FTE was made to her in September 2016, meaning that she was required to bring her STD claim by September 2018. [GDEC, Ex. C; PD, Ex. 17.] She did not do so. [ECF 1.] As a result, her 2016 STD claim is time-barred. *Guercio v. Prod. Automation Corp.*, 664 N.W.2d 379, 387 (Minn. App. 2003)); *Park Nicollet Clinic*, 808 N.W.2d at 833.

### B.   MCHS-SE's STD Policy is not a contract.

MCHS-SE's STD Policy states, "The contents of this policy are not intended to constitute a contract of employment." [PD, 158-59, Ex. 15.] In Minnesota, such a disclaimer means that the policy does not constitute a contract. *See, e.g., Coursolle v. EMC*

*Ins. Group, Inc.*, 794 N.W.2d 652, 660 (Minn. App. 2011).   As the court stated in

*Coursolle,*

> The disclaimer language in the EMC employee handbook clearly and
> definitely states that the handbook is not a contract. The disclaimer language
> is substantially similar to disclaimer language in other cases in which this
> court has concluded that an enforceable contract did not arise. . . The
> disclaimer in EMC's employee handbook effectively stated that EMC had no
> intention of entering into an enforceable contract with the company's
> employees, including Coursolle.

*Id.* (citations omitted.) The same conclusion applies here.   MCHS-SE's STD Policy

"clearly and definitely" states that it is not a contract.[16]

Placzek admits that she did not have a contractual right to benefits or a particular

calculation under MCHS's STD Policy.  [PD, 158-59.]  Under MCHS's policy, STD is a

"voluntary" benefit that MCHS-SE could modify at any time.  [GD, 129.]  This benefit is

not contractual.

### C.    Placzek is not entitled to seven additional days of STD benefits for 2015.

The Agreement states that Placzek would participate in MCHS-SE's benefits "to the

extent set forth under the terms of such plans, as adopted and amended by Employer from

time to time."  [PD, Ex. 3, § 9.]  Placzek cannot prove a right to seven additional days of

STD benefits for 2015.

---

[16]  To the extent Placzek claims a right to vacation benefits from MCHS-SE, this same
analysis applies to that claim.  The policies on which Placzek bases an entitlement to
vacation benefits include similar disclaimer language.  [PD, Exs. 18-19.]

As the court held in *Lee,* any right Placzek had to STD is "wholly contractual." *Lee*, 741 N.W. 2d at 126. STD Policy does not require MCHS-SE to provide Placzek with an additional seven additional days of STD benefits for 2015.

Placzek's 2015 STD claim also fails because she did not timely submit a claim for benefits or complete a release allowing RCS to evaluate and process her claim, both of which are required under the policy. [PD, Ex. 15.] A condition precedent calls for the performance of some act or event after the contract is formed. *Lake Co. v. Molan*, 131 N.W.2d 734, 740 (Minn. 1964). A party to a contract containing a condition precedent does not acquire any rights under that contract until and unless the condition occurs. *Nat'l Union Fire Ins. v. Schwing Am., Inc*., 446 N.W.2d 410, 412 (Minn. App. 1989). If the event required by the condition does not occur, no breach of contract occurs because the contract is unenforceable. *Id.; Aslakson v. Home Sav. Ass'n*, 416 N.W.2d 786, 789 (Minn. App. 1987).

Here, MCHS-SE's STD Policy required Placzek to complete paperwork in MCHS's Employee Self Service center on-line and submit a claim to RCS for processing. [GD, 94, Ex. 7; PD, 150-152; Exhibit 15.] She also was required to submit a signed authorization to allow RCS to process the claim. [GD, 88.] Placzek admits that she did none of these. [PD, 125, 126-128, 150-152.] Because no claim was initiated, MCHS-SE could not process or pay the same. [GD, 109-112).]

Placzek further cannot identify any dates in 2015 on which she claims she should have been paid STD, let alone seven specific days. [PD, 129.] Because she cannot identify

any dates in 2015 on which she claims the right to STD, she cannot prove an entitlement to STD. *Lee*, 741 N.W. 2d at 126-30.[17]

D.   **Placzek cannot prove an entitlement to STD benefits in 2016 based on her actual FTE level.**

Placzek was an exempt employee. Nothing within the STD Policy requires MCHS-SE to pay an exempt employee benefits based on that employee's actual FTE. [PD, Ex 15.] Placzek can point to nothing requiring MCHS-SE to calculate STD based on her actual FTE. Because her right to STD is "wholly contractual," *Lee*, 741 N.W. 2d at 126, Placzek must prove that MCHS-SE was required to pay her STD benefits at a particular level. She cannot. Indeed, MCHS-SE's STD Policy discusses payment of STD based on a physician's "designated FTE," not actual FTE. [PD, Ex. 15, at 1 (procedure for STD benefits).]

MCHS-SE is entitled to calculate the benefits it provides under its voluntary STD Policy as it sees fit. *Lee*, 741 N.W. 2d at 126.Placzek concedes that she was paid according to the normal STD process. [PD, 160-161, 165, Ex. 3.] She cannot show MCHS-SE breached any contract related to the level of STD benefits received in 2016.

E.   **Placzek Had No Right to Paid Vacation.**

Placzek claims that MCHS-SE failed to provide paid vacation for her maternity leave in 2016. [PD, 31.]The right to paid time off is a "wholly contractual," not statutory, in Minnesota. .*Lee*, 741 N.W. 2d at 123. The Agreement does not provide for paid

---

[17]   In 2017 MCHS-SE paid Placzek five days of STD for 2015, an amount in excess of what she was entitled to receive based on RCS's calculations. [GD, 109-112, 114, 120-121, Ex. 13.] As a result, Placzek cannot show any breach by MCHS-SE or that she suffered damages in 2015 related to STD.

vacation. [PD, 58, Ex. 6, § 9.] For an ER physician, Placzek admits that vacation was included in the physician's salary. [PD, 184, 186.]

Placzek attempts to rely on a "Professional Absence Record" to provide a right to vacation benefits. [PD, Ex. 19.] But she admits that this policy only provides for paid vacation *if* she was entitled to them. [PD, 180.] This was confirmed by MCHS-SE leadership. [MD, 74.] Placzek simply did not have the right to paid vacation.

The only other MCHS-SE document Placzek points to is a Physician Benefit Highlights for 2013. This document, however, does not promise *paid* vacation. [GD, 46, Ex. 6 at 3.] Also this document does not apply to Placzek, who actually received a far greater benefit. [MD, 30-32.]

Vacation was built into the compensation model during the entirety of Placzek's employment. [MD, 63.] When the compensation model changed in 2016 from hourly to salary, Placzek accepted that that model—and its treatment of vacation—by continuing her employment. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 625-27 (Minn. 1983). Her claim for paid vacation is meritless.

## IV. PLACZEK'S DECLARATORY JUDGMENT CLAIM FAILS BECAUSE HER CONTRACT CLAIM FAILS.

Placzek bases her entitlement to a declaratory judgment on her contract claim. [ECF 7, ¶ 31.] Because Placzek's breach of contract claim fails, she is not entitled to declaratory relief. *Graham*, 515 N.W.2d at 84.

## V.   PLACZEK'S SECTION 181.101 CLAIM FAILS.

Because Placzek cannot prove a breach of contract by MCHS-SE, she can prove no

claim under Section 181.101.  The Minnesota Payment of Wages Act "does not create a

substantive right to the recovery of a particular wage."  *Caldas v. Affordable Granite &*

*Stone, Inc.*, 820 N.W.2d 826, 837 (Minn. 2012); *see Lee*, 741 N.W.2d at 125 (explaining

that a similar provision, Section 181.13, reflects the legislature's intent to create "a timing

statute, mandating not what an employer must pay a discharged employee, but when an

employer must pay a discharged employee").  Placzek's claim under Section 181.101 must

be dismissed because she cannot prove a contractual right to the benefits she seeks (or a

breach of any alleged contract).

## VI.   PLACZEK'S WHISTLEBLOWER CLAIM FAILS.

Minnesota courts apply the well-known *McDonnell-Douglas* test to MWA claims.[18]

*Warmbold v. MINACT, Inc.*, 2017 U.S. Dist. LEXIS 175883, *9-10 (D. Minn., Oct. 24,

2017):

> Minnesota courts analyze MWA claims under the burden-shifting analysis
> of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817,
> 36 L. Ed. 2d 668 (1973). *Cokley v. City of Otsego*, 623 N.W.2d 625, 630
> (Minn. App. 2001). Under this framework, the employee has the burden to
> first establish a prima facie case by showing:  (1) the employee engaged in
> statutorily-protected activity; (2) the employer took an adverse employment
> action against the employee; and (3) there exists a causal connection between
> the first two elements. *Id*. If the employee meets this burden, "the burden of
> production then shifts to the employer to articulate a legitimate, non-
> retaliatory reason for its action." *Id*. "The ultimate burden of proof then rests
> with the plaintiff to prove that the proffered reason is merely a pretext and

---

[18] Placzek has no direct evidence of retaliation by Mayo Clinic so the *McDonnell-Douglas*
test applies.  *See Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 470 (8th Cir. 2016).

that retaliatory animus motivated the adverse action." *Buytendorp v. Extendicare Health Servs., Inc*., 498 F.3d 826, 834 (8th Cir. 2007).

As *Warmbold* notes, "The burden is always on the employee 'to prove by a preponderance of evidence that the employer's action was for an impermissible reason." *Id*.

Placzek's whistleblower claim fails because:  (a)  MC was not her "employer" (*see supra* at II.C); (b) her FTE concerns do not amount to reports of a violation or planned violation of law; (c) Placzek suffered no adverse action; (d) there is no causal connection between MC's decision to end her CA appointment and the discussions she was having regarding her FTE status at MCHS-SE; and (e) she cannot prove that MC's legitimate, non-discriminatory reason for ending her CA appointment was pretext.  In essence, Placzek's whistleblower claim fails in all respects.

## A.     Placzek did not report a violation or planned violation of law.

Placzek must establish that she reported "in good faith . . . a violation, suspected violation, or planned violation of any federal or state law" to MC.  Minn. Stat. § 181.932, subd. 1(1); *Warmbold*, 2017 U.S. Dist. LEXIS 175883, at*9.[19]  She cannot do so because, as an exempt employee, her FTE status was irrelevant to her FTE.

The issue Placzek raised with MC leadership (on which she bases her whistleblower claim) was that her actual FTE level was higher than the level MCHS-SE had set for her. [PD, at 196-97.]  But Placzek admits that MCHS-SE could modify her schedule or change her assignments as it saw fit.  [*Id*., 54-55, Ex. 6, §§ 2-3.] Placzek also agreed to "devote all

---

[19] *Friedlander v. Edwards Lifesciences, LLC*, 900 N.W.2d 162 (2017), does not affect the MWA requirement that a plaintiff prove a violation or suspected violation of law. *Warmbold,* 2017 U.S. Dist. LEXIS 175883 at *12.

of [her] professional time, attention, knowledge and skills solely to the business and affairs of [MCHS-SE]." [*Id.*, Ex. 6, §3.] Thus, Placzek had no contractual right to a particular FTE level. As an exempt employee, she was required to work whatever hours were set and devote all of her professional time.

Additionally, whether Placzek's actual FTE was the same has her assigned FTE is legally irrelevant because, as a professionally exempt employee, she was required to work whatever hours were necessary to perform her job duties. *See* 29 U.S.C. § 213(a)(1); 29 CFR § 541.301, .304; *In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910, 923-25 (D. Minn. 2010) (discussing professional exemption under FLSA). Complaining about her actual versus scheduled FTE level amounts to nothing more than a complaint about working too many hours. As an exempt employee, such complaints are not legally relevant and therefore cannot form the basis of a whistleblower claim against an employer.[20] *Warmbold*, 2017 U.S. Dist. LEXIS 175883, *9-10.

Placzek's complaints regarding her FTE level are no different than complaints made by exempt employees every day. Should the Court determine that such complaints are actionable under the MWA, then every exempt employee in Minnesota may assert a claim. Such a result is clearly not intended.

### B.   Placzek suffered no adverse employment action.

An adverse employment action is a tangible change in working conditions that

---

[20] Under the FLSA regulations, physicians are not subject to the salary basis test. 29 CFR § 541.304(d). As a result, any argument by Placzek that her FTE concerns related to her compensation are meritless. Also, the Agreement gave MCHS-SE the discretion to alter her compensation at any time. [PD, Ex 6, § 9 and Ex. A.]

produces a material employment disadvantage. *Holland v. Sam's Club*, 487 F.3d 641, 645 (8th Cir. 2007); *Bradford v. Norfolk Southern Corp.*, 54 F.3d 1412, 1420 (8th Cir. 1995). Placzek suffered no adverse action. After her CA appointment ended, she remained employed by MCHS-SE, her Agreement remained in place, and she continued working as she had previously. Indeed, when Placzek's .20 CA appointment ended, MCHS-SE offered to increase her FTE at MCHS-SE 1.0. [GDEC, ¶¶ 14, 16, Ex. D.] Placzek initially agreed to this, but decided to stay a .80 FTE employee after her maternity leave ended. [*See* supra at V.] As a result, she lost nothing by way of work level, income, or status at MCHS-SE. *See Zhuang v. Datacard Corp.*, 414 F.3d 849, 854 (8th Cir. 2005).

### C.   No causal connection exists between Placzek's complaints to MC and the end of her CA appointment.

A causal connection exists between protected conduct and an adverse employment action only "when one event is generated by the other." *A Xiong v. Minneapolis Pub. Sch.*, 2019 WL 4409715, at *2 (Minn. App. Sept. 16, 2019) (copy attached to Bradley Declaration); *see also Judge v. Susee*, 2006 WL 463534, at *7 (D. Minn. Feb. 24, 2006). Here, Placzek also cannot prove a causal connection between her discussions with MC regarding her FTE status and the ending of her CA appointment. The conduct that led to the ending of her CA appointment occurred both prior to and after here discussions with MC staff regarding her FTE status. *A Xiong,* 2019 WL 4409715 *3.

Placzek's discussions with MC regarding her FTE status at MCHS-SE did not begin until late 2015 —well after her inappropriate conduct had started. [*Supra* at IV, X.] Placzek's inappropriate conduct at MC began in 2014 and continued into September 2016.

[*See supra* at IV.]   Indeed, MC received complaints about Placzek only days before the decision was made to end her Placzek's CA appointment in September 2016—complaints that referred to Placzek's practice style as "aberrant" and included complaints by various residents.   These intervening actions demonstrate that no causal connection exists between her discussions with MC staff about her FTE and the decision to end her CA appointment. *See, e.g., Erenberg v. Methodist Hosp.*, 357 F.3d 787, 793 (8th Cir. 2003); *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1998); *Mervine v. Plant Eng'g Servs., LLC,* 859 F.3d 519, 526 (8th Cir. 2017).

The only connection Placzek offers is Dr. Sadosty's alleged "disapproval" with her for contacting OSS when she should have been speaking with MCHS-SE leadership.   But Dr. Sadosty's request that Placzek direct her questions to MCHS-SE staff is only evidence that both MC and MCHS-SE wanted Placzek to consult the entity (MCHS-SE) that could actually address her questions; it proves no retaliatory motive.   Indeed, Placzek was told, both before and after her CA appointment ended, that questions should be directed to MCHS-SE. [GD, 91, Ex. 12; GDEC, ¶ 17.]   Any alleged "disapproval" with the fact that Placzek was bringing her issues to the wrong people is not evidence of a causal connection.

Placzek has no evidence that the MC Personnel Committee, which approved the termination of her assignment,[21] was aware of, or in any way motivated by Placzek's raising issues regarding her FTE. *See Osland v. City of Minneapolis*, 2018 Minn. App.

---

[21]   The Mayo Clinic Personnel Committee was the group responsible for approving and modifying any clinical appointments under the CA Policy.  [GDEC, Ex. A.]

Unpub. LEXIS 756 (Minn. App., Sept. 4, 2018) (copy attached to Bradley Declaration).

As in *Osland*, Placzek has not provided evidence that the majority of MC's Personnel

Committee were aware of her complaints.

Placzek acknowledges that her discussions with OSS continued after the CA

appointment ended and that she was encouraged to continue to raise issues with the

MCHSE-SE Personnel Committee, as well.  [PD, 220; GDEC, Ex. D.]This is additional

evidence that no causal connection exists between her raising FTE issues with MC and the

ending of her CA appointment.

### D.   MC had legitimate reasons to end Placzek's CA appointment and she cannot show pretext.

MC had a legitimate, non-retaliatory reason for ending Placzek's CA appointment—

her inappropriate conduct.  Placzek demonstrated inappropriate conduct throughout her CA

appointment.  [*See supra* at IV.]  This constitutes a legitimate, non-retaliatory reason to

end her CA appointment.  *See E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 970 (8th

Cir. 2014).[22]

In the face of this legitimate, non-retaliatory reason, Placzek cannot prove pretext.

The pretext inquiry requires the court to examine whether the "'proffered reason was in

fact the real reason the employer acted or if it was really a pretextual explanation for

intentional discrimination.'"  *Klyuch*, 393 F. Supp. 2d at 794-95.  "Evidence of pretext

includes showing that the proffered explanation had no basis in fact; that it was not the

---

[22]   "The Court is not required to 'second guess' the employer's business decision or determine whether the 'employer's explanation was a good or bad business reason.'"*Klyuch v. Freightmasters, Inc.*, 393 F. Supp. 2d 788, 794 (D. Minn. 2005).

employer's policy or practice to respond to such problems as it did; that similarly situated persons received more favorable treatment; or that a discriminatory attitude existed in the workplace." *Id.*; *Dragonite v. South Lake Clinic, P.A.*, No. 17-3785 (MJD/SER), ECF 59 (D. Minn., Oct. 2, 2019). Placzek can prove none of these factors.

Placzek engaged in the conduct of which she is accused so she cannot prove that MC had no factual basis to end her CA appointment. [PD 102, 104-106, 109-111, 215.] Placzek also cannot prove that MC was not following its normal policies or practices when it ended her CA appointment.

Further, Placzek cannot identify a similarly situated CA[23] working in MC's emergency medicine department whose bad conduct was similar to Placzek's, who did not complain about FTE issues, and whose CA appointment for that bad conduct was not ended. *EEOC v. Kohler Co.*, 335 F.3d 766, 776 (8th Cir. 2003).

Finally, Placzek has no evidence that an attitude existed at MC that did not allow her to discuss issues such as her FTE status. Although Placzek was told to bring these concerns to the proper entity (MCHS-SE), she was still encouraged to do so. [*See* PD, 220; GDEC, Ex. D.]

## CONCLUSION

Placzek's claims are based on a fundamental misunderstanding of her practice privileges at MC, exempt status with MCHS-SE, and MCHS-SE's policies. Having practice privileges at MC did not make Placzek MC's employee. As an exempt employee,

---

[23] The test to prove a similarly situated employee is a "rigorous one." *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479-80 (8th Cir. 2004).

it mattered not what her FTE level was actually versus on paper. She was required to work the hours necessary to complete her job and was not legally entitled to greater compensation for doing so. MCHS-SE has the right to adopt policies that do not provide for paid vacation to ER physicians and place limits on STD benefits and how they are calculated. None of these actions constitute a breach of contract, none should be declared a breach of contract, and none violated Section 181.101. MC also did not violate the MWA by ending Placzek's CA appointment. Placzek's claims are therefore meritless and Defendants should be granted summary judgment on them.

Date: January 31, 2020.

*s/ George R. Wood*

George R. Wood (#0166017)
gwood@littler.com
Jessica J. Bradley (#0392447)
jbradley@littler.com
**LITTLER MENDELSON, P.C.**
1300 IDS Center, 80 South 8th Street
Minneapolis, MN 55402.2136
Telephone: 612.630.1000

**ATTORNEYS FOR DEFENDANTS
MAYO CLINIC AND MAYO CLINIC
HEALTH SYSTEM-SOUTHEAST
MINNESOTA REGION**

4836-8900-8819.1 087104.1011

33